J-A07008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.W., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1585 MDA 2023 |

Appeal from the Order Entered November 6, 2023
In the Court of Common Pleas of Cumberland County
Orphans' Court at No:  39 Adoptions 2023

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                **FILED MAY 07, 2024**

A.W. (Mother) appeals from the November 6, 2023 decree involuntarily terminating her parental rights to her biological daughter, A.W., born January 2015.[1]  Upon review, we affirm the termination decree.

We glean the factual and procedural history from the certified record, particularly the transcript and exhibits from the termination hearing on October 25, 2023.  On August 28, 2022, Cumberland County Children and Youth Services ("CYS") received an allegation that A.W.'s older brother, A.J.W., touched her in a sexual manner.  N.T., 10/25/23, at 8.  The same day, police and CYS visited the home and spoke with Mother and P.W., Maternal Grandmother.  *Id.* at 9.  Both women denied that anything happened between

---

[*] Former Justice specially assigned to the Superior Court.

[1] The parental rights of A.R.W.'s biological father, S.P. were voluntarily terminated on October 25, 2023.  He did not file an appeal.

the children and stated that A.W. was lying. *Id.* Based on Mother's denial of the allegation, CYS was awarded protective custody of A.W. and, at a shelter care hearing held the next day, the court determined A.W. should remain in the custody of the agency.[2]

A.W. was adjudicated dependent on September 8, 2022, and placed in foster care, where she has remained during the pendency of these proceedings. On September 6, 2023, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b).[3] The trial court held a goal change and termination hearing on October 25, 2023, wherein CYS presented the testimony of: (1) Sandra Gibson, CYS caseworker; (2) Michele Rush, parenting educator at Alternative Behavior Consultants ("ABC"); (3) Linda Mapes, visitation supervisor at ABC; (4) A.W. in chambers; (5) Katie Harbster, A.W.'s mental health therapist; (6) Jennifer Walizer, service provider for A.W.; (7) Sheena Stoner, Diakon SPIN program caseworker; and (8) Luke Seckar, foster parent. CYS also introduced several exhibits, including permanency plans, family service plans and pleadings filed on the dependency docket, evaluations of Mother, and visitation summaries. N.T., 10/25/23, at 5-6. Mother testified on her own behalf and presented the

_____

[2] Father was unable to be a resource because he was subjected to a protection from abuse order protecting Mother and the children. *Id.* at 9. He also has nine convictions of incest and was on parole at the time. *Id.* at 9-10.

[3] Cindy Martin, Esquire was appointed as legal counsel for A.W. *See* Order, filed 6/16/23. Tammi Blackburn, Esquire, served as guardian *ad litem* for A.W. *Id.*

- 2 -

testimony of her counsel, Judith Negron Torress, as well as submitting several letters of support from family and friends. *Id.* at 6.

At the conclusion of the hearing, the trial court took the matter under advisement and ultimately entered a decree involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b). This timely appeal followed. Mother raises three issues for our review:

1. Did the [trial court] err as a matter of law and abuse its discretion when it found sufficient grounds existed for termination of [Mother]'s parental rights to her child, despite a lack of clear and convincing evidence, thus contravening section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)?

2. Did the [trial court] err as a matter of law and abuse its discretion in terminating [Mother]'s parental rights when the conditions which led to the removal or placement of the child no longer existed or were substantially eliminated, thus contravening section 2511(a) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a), (b)?

3. Did the [trial court] err in determining the best interests of the child would be served by terminating parental rights when [Mother], if given sufficient time, would be ready, willing, and able to parent the child and provide for her needs, thus contravening section 2511(b) of the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 4.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted).

"We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(8) and (b). We begin our analysis with Section 2511(a)(8), which states:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). Stated another way, three prongs must be met: (1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions which led to the removal or placement of the child still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See M.E.*, 283 A.3d at 832.

"Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *Id.* The relevant inquiry is "whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent **at the time of the hearing**." *Id.* (emphasis added). Additionally, the Adoption Act prohibits the court from

- 5 -

considering any efforts by the parent to remedy the conditions that began after the filing of the termination petition. *Id.*

"This Court has recognized that application of § 2511(a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *Id.* (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006)) (quotations omitted). However,

> by allowing for terminating when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*Id.* (emphasis in the original).

Mother contends that CYS failed to prove by clear and convincing evidence that her conduct warranted termination under Section 2511(a)(8). Specifically, she argues (1) that she was provided notice of CYS' intent to terminate her parental rights 11 months after A.W. was removed from her care, and (2) the conditions which led to A.W.'s no longer existed or were substantially eliminated. *See* Mother's Brief at 8-35. We disagree.

With respect to the first prong, Mother argues that CYS provided her notice of its intent to terminate her parental rights eleven months after A.W.'s

removal, and not twelve months as required by statute. **See** Mother's Brief at 11. She argues "it became clear [that CYS] was already finished pursuing reunification and set on terminating Mother's rights." **Id.**

The language of the statute and our case is clear that "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." **In re A.R.**, 837 A.2d 560, 564 (Pa. Super. 2003). The time is typically calculated from the date of the child's removal or placement to the date a petition to terminate parental rights is filed. **See In re C.B.**, 230 A.3d 341, 351 (Pa. Super. 2020), *appeal denied*, 234 A.3d 410 (Pa. 2020) (finding the relevant time-period to be twelve months prior to the filing of a termination petition); **In re J.F.M.**, 71 A.3d 989, 993 (Pa. Super. 2013) (same); **In re Adoption of R.J.S.**, 901 A.2d 502, 512 (Pa. Super. 2006) (same).

Here, A.W. was removed from Mother's home on August 28, 2022 and CYS filed a petition to terminate Mother's parental rights on September 6, 2023. A total of twelve months and 9 days lapsed from when A.W. was removed. **See A.R., supra.** Therefore, the first prong of Section 2511(a)(8) is satisfied.

For the second prong, the trial court found clear and convincing evidence that the conditions which led to A.W.'s removal from Mother's home continue to exist. The child was removed because of (1) Mother's lack of capacity to ensure A.W.'s safety through adequate supervision in the home and

prioritization of A.W.'s welfare and (2) Mother's mental health to the extent it affects her parenting skills and ability to provide supervision. *See* Trial Court Opinion, 12/15/23, at 5-6.

Significantly, the trial court and CYS were concerned that Mother continued to dismiss A.W.'s disclosures and would not entertain the possibility that they could be true. N.T., 10/25/23, at 11. A.W. disclosed that A.J.W. went into her room and touched her on her skin in her underpants. *Id.* at 42. Also, Maternal Grandmother caught an adult male neighbor in A.W.'s bedroom. *Id.* at 42-43. Separately, two brothers in the neighborhood disclosed that A.J.W. touched them in a sexual manner. *Id.* at 35. The trial court explained:

> [Mother] continued to deny the veracity of [A.W.]'s allegations up to and including the day of the termination hearing. Compounding the denial, [Mother] attempted at the hearing to suggest that she had no idea that the allegations [A.W.] made against [A.J.W.] were sexual in nature, which was as puzzling as it was patently incredible. As noted herein, the allegations were discussed at every hearing, the parenting services [Mother] received in the home were targeted at [Mother]'s supervisory capacity and [A.J.W.]'s sexual behaviors[.] [Mother] testified contrary to this statement shortly after making it, and the majority of the witnesses testified that they discussed the allegations with [Mother] (and she either denied their veracity or said she did not wish to "pick a side").

> \* \* \* \*

> We note that over the months leading up to termination, [Mother] was observed by the hearing officer to have openly dismissed the allegations and competent evidence at the terminating hearing reported that [Mother] suggested on more than one occasion that [A.W.] made the allegations up in order to obtain a nicer home with wealthier parents, and that a month after the disclosure,

[Mother] told the parenting evaluator that the investigation was "BS" and that [CYS] and the police ruined a relaxing day she was having when they appeared to remove [A.W.].

Trial Court Opinion, 12/15/23, at 17-18. The trial court went on to say, assuming Mother wanted to "stay neutral," "her indifference was deeply exacerbated by her unwillingness to meaningfully engage in the services provided to . . . assist her with supervision in the home and other parenting skills." *Id.* at 18.

Mother completed a Family Assessment for Service and Treatment ("FAST") which recommended: (1) Mother to participate in Training for Improved Parenting Skills ("TIPS") at ABC; (2) continue mental health counseling; and (3) complete a psychiatric evaluation to ascertain the need for medication. *Id.* at 13. We note, and the trial court highlighted, the following excerpts from the October 2022 assessment:

> When asked about the current referral, [Mother] described the agency as "child-stealing thieves" who showed up while she was having a relaxing day. . . . [Mother] is prohibited from discussing these allegations with [A.J.W.] and said there is an ongoing police investigation but [Mother] believes it is "BS crap." . . . [Mother] thinks the agency referred her for the FAST because they don't trust her to be alone with her daughter.
>
> * * * *
>
> . . . She described herself as cold-hearted, has an attitude, and hates people. [Mother] said her strengths include knowing how to be a mama bear and standing up for herself and she couldn't name any weaknesses. . . .
>
> When asked her concerns with [A.J.W.], [Mother] said that his behavior is just like [hers], meaning he hates the cops and CYS and people that get in his business and he perceives the world as

evil. Currently in 6th grade, [A.J.W.] has an IEP for speech, language, math, and reading. [Mother] shared that since the most recent CYS involvement, [A.J.W.] has had some behavior problems and he told a kid to "F" off. . . . [Mother] puts restrictions on the children's online access in the home but did know if [A.J.W.] has been exposed to sexual content outside the home. She was not comfortable repeating [A.W.]'s allegations and doesn't believe the abuse was possible because they are never alone in the home and don't share a bedroom. . . .

[Mother] said she has difficulty getting [A.W.] to stop viewing YouTube where she has learned a lot of "crap" which has resulted in her wanting a new mommy and daddy who had more money. . . . [Mother] said [A.W.] has never disclosed that she was uncomfortable with her brother. [Mother] believes that [A.W.] will now need mental health treatment after all "this shit." [Mother] has had parenting before and if referred wouldn't be happy about it. She previously participated in a parenting service with ABC to help her deal with [A.J.W.]'s behaviors.

. . . [Mother] said the best part of being a parent is "being able to make my own rules, doing my own thing, not having to answer to anyone," and regarding the hardest part, she stated, "I didn't think it was hard." With regards to what she would like to learn, [Mother] responded, "nothing to learn. I do things as a parent my own way," and she did not endorse any topics for which she would like more information.

CYS Exhibit 4, FAST Evaluation and Recommendation, 10/17/22, at 2-5.

Mother completed the TIPS program from October to December 2022. *Id.* Ms. Rush is a parenting educator at ABC and worked with Mother in the TIPS program. *Id.* at 54. She was concerned with how Mother engaged with A.J.W., that she was extremely negative and how those negative behaviors were affecting her and her son's interactions with service providers. *Id.* at 57.

For example, Ms. Rush said, she would knock on the door and [Mother] would say, "the witch is here," and her son would mimic

- 10 -

it. The [CYS] caseworker noted similar concerns; she said [Mother] would say something, her son would repeat it, and they would both laugh. For example, when the caseworker handed [Mother] the Family Service Plan, [Mother] threw it on the floor, said that anything from [CYS] goes right in the trash, and, upon being pressed to sign on the acknowledgement line, [Mother] wrote, "hail Satan 666," and laughed, and then her son signed the same way.

Trial Court Opinion, 12/15/23, at 6 (internal citations to record omitted). Ms. Rush testified that Mother was very clear that she was willing to work on parenting only while providers were in place and until A.W. returned to her, not because Mother believed any changes were necessary. N.T., 10/25/23, at 56.

After completing TIPS, Mother did not progress to SKILLS because she refused to get a psychiatric evaluation. *Id.* at 54-55. Mother is diagnosed with bipolar disorder, borderline personality disorder, post-traumatic stress disorder ("PTSD"), and anxiety. *Id.* at 125. She has taken medication in the past, but stopped taking medication when she was pregnant with A.W. and did not continue them after her birth. *Id.* at 125, 147-48. She felt like a "human guinea pig" because doctors kept prescribing and changing her medication. *Id.* at 125-26. She did not like the way medication made her feel and would only take medication again if "she had to." *Id.* at 125, 149-50.

Ms. Gibson testified that since 2010, CYS has received seven general protective service referrals, a majority were concerns for Mother's mental health. *Id.* at 24. The past referrals were similar to the current one to the

extent that they involved Mother's inability to provide appropriate parenting and supervision. *Id.* at 25. However, the past referrals did not involve any sexual allegations. *Id.*

Mother's refusal to obtain a psychiatric evaluation was a significant impediment to her willingness to participate in the services offered by CYS.

> [A]s early as . . . October 2022, [Mother] was directed to obtain a psychiatric evaluation, which she never obtained, despite discussion of the requirement at each permanency review hearing, the listing of the requirement in the Family Service Plans, discussion of the requirement between [Mother] and ABC and the caseworker over the life of the case, and *[Mother]'s acknowledgment at the termination hearing that she knew getting the psychiatric evaluation was a condition to [A.W.] returning home.*

Trial Court Opinion, 12/15/23, at 10 (emphasis in the original). The permanency review orders leading up to the termination hearing explained, "[r]egardless of how she achieves the stability, ABC requires, and this [c]ourt finds the requirement reasonable, that [Mother] demonstrate the ability to control her own emotions and recognize how her behaviors impact her children." CYS Exhibit 1, Permanency Review Order, 7/24/23, at 3.

Ms. Rush testified that Mother's behaviors caused safety issues because she put up barriers between herself and others which prevented her from setting safety parameters for the children. N.T., 10/25/23, at 61. For example, Mother installed cameras outside of her home. *Id.* However, when Ms. Rush tried to discuss setting limits, such as not allowing A.J.W. to come and go, Mother would state that she has cameras. *Id.* at 61-62. She was not

able to correlate the fact that when A.J.W. left the home, he was no longer being supervised. *Id.* at 62.

Ms. Gibson similarly testified:

[A.J.W.] pretty much comes and goes and he pleases, so cameras will always show him leaving and coming to the home. In the home . . . [s]he has to be aware and she has to observe and she has to know where the children are together or not together and that was not happening and I don't see it happening.

*Id.* at 35. One time Ms. Gibson was at the home, A.J.W. left around 6:20 p.m. and had not returned when she left around 8:00 p.m. on a school night. *Id.* at 36. Mother seemed unconcerned and commented "he's out in the neighborhood." *Id.*

Mother refused to obtain a psychiatric evaluation because her counselor did not believe the evaluation was necessary "due to the mere fact that I did not meet a majority of the criteria for that." N.T., 10/25/23, at 123. At the termination hearing, Mother testified that she would now complete the psychiatric evaluation "just to get [Ms. Gibson] to leave me alone about it." *Id.* at 124. Mother's stated effort is too little, too late as her willingness to remedy the conditions *after* the filing of the petition to terminate are not relevant. *See M.E., supra.*

Ms. Torres is a licensed professional counselor who initially worked with A.J.W. in 2017 due to attachment difficulties, then began treating Mother in 2018. *Id.* at 161-62. She sees Mother weekly to work on "[i]ncreasing healthy grounding and coping tools, reactiveness, [and] addressing trauma

experiences." ***Id.*** at 163. Ms. Torres stated that she did not believe Mother needed a psychiatric evaluation because she was stable and "had been gaining some skills and I believe that she could work on self[-]management, and **she did not want a psychiatric evaluation**." ***Id.*** (emphasis added).

Based on the foregoing, we find that the conditions which led to A.W.'s removal continue to exist. Mother continues to dismiss A.W.'s disclosures, has not demonstrated that she can provide appropriate supervision of A.J.W. and has steadfastly refused to obtain an updated psychiatric evaluation, which she knew was a prerequisite to reunification with A.W. Accordingly, we find the second prong of Section 2511(a)(8) is satisfied.

The third prong of Section 2511(a)(8) is a "needs and welfare" analysis, similar to a Section 2511(b) analysis:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. . . . Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" . . . as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

***In re C.L.G.***, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*) (internal citations omitted).

Here, the trial court found by clear and convincing evidence that termination of Mother's parental rights would best serve A.W.'s needs and welfare. Mother asserts that the trial court failed to consider her bond with A.W. and the negative impact of terminating that bond. Mother's Brief at 42. We disagree.

The trial court found that the evidence showed that Mother and A.W. have a bond and love each other. *See* Trial Court opinion, 12/15/23, at 21. However, "it seems [A.W.] showed more interest in [Mother] than vice versa." *Id.* From the outset of the proceedings, Mother was afforded two hours of supervised visitation at ABC. N.T., 10/25/23, at 19. Mother was consistent with visitation and only missed one visit. *Id.* However, visits never increased in time or progressed beyond supervised primarily due to Mother's lack of engagement. *Id.* at 20. Ms. Mapes supervised the most recent visits and said she wanted to see Mother "actually sit down and play a game or read a book that she has expressed are stupid. Respond when [A.W.] asks her to do something." *Id.* at 66. For example,

> [A.W.] will start to talk to [Mother] and [Mother] will interrupt her and stop her and start talking about something that either she has done or [A.J.W.] has done and things outside of ABC. Not really showing much attention towards what [A.W.] is doing. . . . [A.W.] will get [a game] all set up, [Mother] will sit there and stare at it.
>
> Just a couple weeks ago I remember [A.W.] saying to [Mother], I guess you are not interested in doing this and she put it away. So [A.W.] is pretty independent while she is there, and [Mother] is not very engaged. That has not improved over the course of the year.

*Id.* at 64. Ms. Mapes also described [A.W.] during the visits:

> I think over the course of time [A.W.] has learned that she's there and does independent play. When they are having a meal, she will ask if [Mother] will put on something on the phone for them to watch. And it's usually at the most five, seven minutes. So it's not a problem because [A.W.] realizes that there is not going to be any conversation.
>
> [A.W.] comes to me often times and will talk to me. We have great conversation[s] coming into the building. She is a little less talkative and maybe not as bouncy and happy as she goes out.

*Id.* at 67-68. Neither A.W. nor Mother show affection towards each other during the visits and only hug at the end of the visit. *Id.* at 69.

Significantly, [A.W.] expressed that she was afraid to return home and felt that Mother would not protect her. Ms. Gibson testified that "[A.W.] is afraid to return home, afraid that nothing will change when she's in that home as to what it was before she was removed. She is also afraid of her brother physically harming her." *Id.* at 21. Ms. Walizer, who provides services to A.W., testified that "[A.W.] has also mentioned that if she were to go home, she would want to hide in her bedroom because she would feel unsafe and be worried that [A.J.W.] would be mean to her or [Mother] wouldn't believe her." *Id.* at 91. She continued, "[A.W.] will say, whenever I go to [Mother] to tell her that something happened with [A.J.W.], she believes [A.J.W.] over me." *Id.* at 93.

A.W.'s legal counsel reported that "[A.W.] relayed to me that she does not feel she would be safe if she returned to [Mother's] home. She does not feel that [Mother] can keep her safe and that she feels safe at the foster

- 16 -

home." *Id.* at 178. Attorney Martin opined that it would be in A.W.'s best interest to terminate Mother's paternal rights. *Id.* Similarly, the guardian *ad litem* reported, "I can't even tell you the amount of time that [A.W.] has used the word safe or safety when talking about her family home and why she might not want to live there." *Id.* at 181. Attorney Blackburn explained that A.W. has significantly progressed in her ability to talk to people and trust people. *Id.* at 180. She opined that it would be in A.W.'s best interest to terminate Mother's paternal rights because A.W. deserves permanency. *Id.* at 182.

> Accordingly, the trial court found:

> We are . . . convinced that [A.W.]'s best interests are served in finding permanency with the foster parents who have loved her, cared for her, put her needs before their own, prioritized [A.W.]'s feelings, believed in her, and allowed her to feel her feelings exactly as they come to her for the last year she has been in their care.

Trial Court Opinion, 12/15/23, at 21. We agree and find that the third prong of Section 2511(a)(8) is satisfied.

Accordingly, there is clear and convincing evidence that A.W. was removed from Mother's home for at least twelve months, there are continued concerns for Mother's mental health, her ability to prioritize A.W.'s needs and provide appropriate supervision, and termination would best serve A.W.'s needs and welfare. Therefore, the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(8).

We now turn to Section 2511(b), which states, in pertinent part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106.

Our Supreme Court has mandated that a Section 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Thus, the court must determine whether the adverse impact of severing the parent-child bond "is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 253.

[B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*K.T.*, 296 A.3d at 1110. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children

- 18 -

cannot be misconstrued as bonding." ***T.S.M.***, 71 A.3d at 267 (citing ***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008)).

However, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." ***K.T.***, 296 A.3d at 1111 (emphasis in the original; internal citations and quotation marks omitted). Thus, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and bonded with foster parents; and (3) whether the foster home meets the child's needs. ***Id.*** at 1113.

We incorporate our Section 2511(a)(8) "needs and welfare" analysis, ***infra.***, and add that A.W. is doing very well in her foster home:

> [A.W.] attends mental health counseling weekly, which she enjoys, and which is focused on anxiety, depression, and day-to-day emotions. She also enjoys her dance classes, which the foster parents feel enable her to put her energy into a constructive outlet. [Ms. Gibson] said [A.W.] is happy in the [foster] home and feels safe, secure, and comfortable there, where her fosters put her needs ahead of theirs and ensure she has everything she needs physically and emotionally. [Ms. Gibson] has observed [A.W.] cuddling up with and hugging her foster parents during home visits and said the affection goes both ways. [A.W.]'s foster father said that [A.W.] has progressed substantially in the past year or so in socialization and trust and that she is flourishing in school. Specifically, [A.W.]'s foster father said [A.W.] initially displayed some trust issues evident by hiding behind furniture. Her foster father said he and his wife try to ensure they communicate to [A.W.] that whatever she is feeling is perfectly fine.

Trial Court Opinion, 12/15/23, at 13 (internal citations to record omitted). The trial court took A.W.'s testimony in chambers, and summarized:

> [S]he said she likes where she is living now because she is safe. She said seeing [Mother] more often would make her happier, but she "just want[ed] the judge to decide" because she didn't want to decide. [A.W.] appeared nervous and attempted to derail the conversation several times by physical activity like performing backbends, and when asked what she was worried about with respect to [A.J.W.], she said in a gloomy, withdrawn fashion she did not want to talk about it.

*Id.* at 15 (internal citations to record omitted).

Based on the foregoing, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to Section 2511(b). Accordingly, we affirm the decree terminating Mother's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/07/2024

- 20 -